UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 26-cr-123** |
| **TIMOTHY HETZEL** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT TIMOTHY HETZEL'S**
**MOTION TO DISMISS THE INDICTMENT**

Defendant Timothy Hetzel, through undersigned counsel, respectfully moves under Federal Rule of Criminal Procedure 12(b)(3)(B) to dismiss the Indictment, which charges Mr. Hetzel with three counts: 1) one count of possessing ammunition in violation of 18 U.S.C. § 922(g)(1); 2) one count of possessing a firearm in violation of 18 U.S.C. § 922(g)(1); and 3) one count of possessing ammunition in violation of 18 U.S.C. § 922(g)(1). Section 922(g)(1) is unconstitutional because it violates the Second Amendment, both facially and as applied to Mr. Hetzel, and also because it exceeds Congress's power under the Commerce Clause, both facially and as applied. Were the Court to grant the motion to dismiss Counts One and Two only, the Court should decline to exercise jurisdiction over the remaining D.C. Code Offense and dismiss it as well.

## I. Introduction

Federal law and the D.C. Code prohibit Timothy Hetzel from possessing a firearm or ammunition because he has a prior conviction for a crime "punishable by imprisonment for a term exceeding one year," that is, a felony and 18 U.S.C. § 922(g)(1). That prohibition violates the Second Amendment, as does the ghost gun prohibition in D.C. Code §22-4514(a).

Under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), a firearm regulation survives Second Amendment scrutiny only if the government proves it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Felon disarmament under § 922(g)(1) cannot make that showing and this motion preserves that facial challenge.

As applied to Mr. Hetzel specifically, this Circuit's recent decision in *United States v. Richardson*, 188 F.4th 412 (D.C. Cir. 2026), does not save this prosecution. *Richardson* upheld § 922(g)(1) only "as applied to felons who are still under supervision as part of a criminal sentence at the time of their 922(g)(1) offense." *Id.* at 144. Mr. Hetzel was under no such supervision when he allegedly possessed the firearm and ammunition for which he is charged in this case. *Richardson* expressly left open the question whether § 922(g)(1) may constitutionally be applied to a felon who has completed his sentence and is no longer on supervision. This Court should hold that it may not. It should similarly hold that the parallel D.C. Code provision in §22-4503(a)(1) is unconstitutional as applied.

Separately, § 922(g)(1) exceeds Congress's power under the Commerce Clause. Under *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), mere possession of a firearm or ammunition is not economic activity Congress may regulate through the Commerce Clause, and a bare allegation that a firearm or ammunition once crossed a state line does not supply the missing constitutional authority. Justice Thomas developed this point at length in his concurrence in *United States v. Hemani*, 608 U.S. 772, 795___, slip op. (Thomas, J., concurring) (2026). And although *Fraternal Order of Police v. United States*, 173 F.3d 898, 907-08 (D.C. Cir. 1999), rejected a similar challenge based on § 922(g)(9)'s "jurisdictional element," that decision rests on a flawed inference from *United*

*States v. Bass*, 404 U.S. 336 (1971), and reiterated *Scarborough v. United States*, 431 U.S. 563 (1977), which a growing body of authority now calls into doubt. *See Alderman v. United States*, 562 U.S. 1163 (2011) (Thomas, J., dissenting from the denial writ of certiorari) ("If the *Lopez* framework is to have any ongoing vitality, it is up to this Court to prevent it from being undermined by a 1977 precedent [*Scarborough*] that does not squarely address the constitutional issue."); *United States v. Squire*, 182 F.4th 481, 482 (5th Cir. 2026) (granting petition for rehearing en banc in case challenging Fifth Circuit precedent relying on *Scarborough* as basis for § 922(g)(1) Commerce Clause authority). And even accepting *Fraternal Order of Police*'s framework on its own terms, the indictment's bare, conclusory jurisdictional allegation does not satisfy the "case-by-case inquiry" that *Lopez* and *Fraternal Order of Police* both require.

**II. Background**

The indictment in this case alleges that on May 16, 2026, Mr. Hetzel, knowing he had previously been convicted of a felony "in Stafford County Circuit Court, Virginia, Criminal Case No. CR16001159-00, did unlawfully and knowingly receive and possess ammunition, that is Blazer Brass 9-millimeter ammunition, which had been possessed, shipped and transported in and affecting interstate and foreign commerce," in violation of 18 U.S.C. § 922(g of D.C. Code §22-4514(a).

Case number CR16001159-00 from a 2018 arrest is a conviction for Selling Stolen Property the was valued at greater than $200. He was sentenced to a period of 5 years probation with 2 years, that appear to have been suspended. Mr. Hetzel's other convictions were for similarly nonviolent offenses (trespassing, theft and bail jumping).

**III. Section 922(g)(1) Violates the Second Amendment, Facially and As Applied to Mr. Hetzel.**

**A. Section 922(g)(1) and D.C. Code §22-4503(a)(1) Are Facially Unconstitutional.**

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. Courts apply a two-step framework set out in *Bruen* to determine whether a particular firearm regulation is constitutional.

***First,*** a court must ask "whether the Second Amendment's plain text covers an individual's conduct," and if so, "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24, 32. ***Second***, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 24. That inquiry "focuses on the principles that underpin our regulatory tradition," and "will often involve reasoning by analogy" to "well-established" historical laws that are "relevantly similar" to the modern regulation. *Rahimi*, 602 U.S. at 692; *Bruen*, 597 U.S. at 28-30. Two features are "central" to the comparison: "why" the historical regulation was in place and the "how" it was historically enforced. *United States v. Hemani*, 608 U.S. 773 (2026) (citing *Bruen*, 597 U.S. at 29; *Rahimi*, 602 U.S. at 692). "The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld," and "the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review." *Id.* at 780-781. The government bears the burden to prove the validity of a Second Amendment restriction throughout. *Bruen*, 597 U.S. at 24.

The D.C. Circuit recently applied the *Bruen* framework in *Richardson* to hold that § 922(g) is constitutional "as applied to felons who are still under supervision as part of a criminal sentence at the time of their 922(g)(1) offense," based on a Founding-era tradition of temporarily disarming felons while they served forfeiture-based sentences. *Richardson*, 2026 WL 2451537, at *1, *4. The panel was careful to note the limits of its holding, expressly

declining to "address the constitutionality of section 922(g)(1) as applied to … other felons" who have "finished serving their sentences," or to "even address whether Richardson, after serving his various criminal sentences, may have a viable Second Amendment claim against the continued application of section 922(g)(1) at that juncture." *Id.* at *5.

Applying *Bruen's* framework facially here, the Second Amendment's text does not exclude people convicted of crimes punishable by more than year, i.e., felons, from "the people" it protects. "The people" is a term of art used consistently throughout the Bill of Rights, and "convicted felons fall within 'the people' as contemplated by the First and Fourth Amendments." *United States v. Carrero*, 635 F. Supp. 3d 1210, 1212 (D. Utah 2022). There is "no reason to adopt an inconsistent reading of 'the people'" in the Second Amendment alone. *Range v. Att'y Gen.*, 69 F.4th 96, 102 (3d Cir. 2023) (en banc), *vacated on other grounds*, 144 S. Ct. 2706 (2024). And in *Rahimi*, the Supreme Court squarely rejected the government's attempt to limit the Amendment's coverage to "responsible" or "law-abiding" citizens, explaining that such a line does not "derive from our case law." 602 U.S. at 701-02; *see also id.* at 773 (Thomas, J., dissenting) ("The Government's claim that the Court already held the Second Amendment protects only 'law-abiding, responsible citizens' is specious at best."); *id.* at 774 (explaining that the government's theory that the Second Amendment protects only "responsible" and "law-abiding" citizens "is the Government's own creation, designed to justify every one of its existing regulations" and "has no doctrinal or constitutional mooring."). Felons thus fall into the category of "people" protected by the Second Amendment and the government must establish a historical tradition of disarming them that applies to Mr. Hetzel.

***Second***, the government cannot carry its burden to show a Founding-era tradition of disarming all felons. The government has itself represented in other courts that "18

U.S.C. §922(g)(1) is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified." Govt. Br. in *United States v. Pettengill*, No. 10-2024, 2011 WL 1977759, at *27-28 (1st Cir. May 13, 2011). Section 922(g)(1) traces to the Federal Firearms Act of 1938, which disarmed only those convicted of enumerated "crime[s] of violence" and Congress did not extend the ban to all felons until 1961. *See* Pub. L. No. 87-342, 75 Stat. 757 (1961); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). A regulation "firmly rooted in the twentieth century" cannot satisfy *Bruen's* demand for a tradition traceable to 1791. *Bruen*, 597 U.S. at 2136-37, 2154 n.28.

*Richardson* did not resolve this facial question. The panel expressly "decline[d] to engage with the broadest arguments pressed by both sides," assumed without deciding that § 922(g)(1) restricts conduct covered by the Second Amendment's text, and rested its holding on the "narrow ground" that "felons still serving their criminal sentences" may be temporarily disarmed. *Richardson*, 188 F.4th at 417. The panel further recognized that "[o]ur sister circuits are deeply divided … on whether lifetime felon disarmament is constitutional absent some individualized inquiry into whether the individual felon is dangerous," comparing *Zherka v. Bondi*, 140 F.4th 68, 74-75 (2d Cir. 2025), and *United States v. Dubois*, 139 F.4th 887, 888-89 (11th Cir. 2025), with *Range*, 124 F.4th 218, 225 (3d Cir. 2024) (en banc), and *United States v. Williams*, 113 F.4th 637, 645-48 (6th Cir. 2024). *Richardson*, 188 F.4th at 417. Mr. Hetzel thus preserves the argument that lifetime disarmament under § 922(g) and D.C. Code §22-4503(a)(1) is facially unconstitutional.

### B. *Richardson's* Narrow Holding Does Not Apply to Mr. Hetzel, Who Had Completed His Entire Sentence for the Predicate Offense Before the Conduct Charged Here.

*Richardson* held § 922(g)(1) constitutional "as applied to felons who are still under

supervision as part of a criminal sentence at the time of their 922(g)(1) offense." *Richardson*, 2026 WL 2451537, at 414 (emphasis added). Mr. Hetzel was not under supervision, and was not serving any part of any criminal sentence, when the conduct charged in the indictment allegedly occurred. His prior convictions were fully resolved before the charged offense. This is precisely the scenario *Richardson* declined to decide. The panel was explicit: "[w]e do not address the constitutionality of section 922(g)(1) as applied to … other felons" who have "finished serving their sentences," and "we do not even address whether Richardson, after serving his various criminal sentences, may have a viable Second Amendment claim against the continued application of section 922(g)(1) at that juncture." *Id.* at 419.

Thus, unlike the defendant in *Richardson*, who committed his § 922(g)(1) offense while still on supervised probation for the very conviction the government charged as his predicate, *id.* at 416, Mr. Hetzel was under no supervision for any offense at the time of charged offense. This distinction is critical. The Founding-era forfeiture laws *Richardson* catalogued disarmed felons who were "still serving their criminal sentences" and the disarmament was a "temporary" incident of an *ongoing punishment*, not a permanent status. *Id.* at 417-420 ("Felons could be *temporarily* disarmed while serving their criminal sentences, including supervision and monitoring.") (emphasis added). None of the historical sources *Richardson* cited — the Pennsylvania, Massachusetts, New York, Maryland, Virginia, and Kentucky forfeiture statutes, or the Shays' Rebellion pardons — disarmed a felon indefinitely after his sentence had been served in full. To the contrary, the entire premise of *Richardson*'s "greater-includes-the-lesser" logic explaining that the lesser restriction of temporary disarmament during supervision was justified because it was derivative of the greater power to imprison, *id.* at 421 (citing *Rahimi*, 602 U.S. at 699), has no application once the greater power has already been

exhausted through completion of the sentence. In other words, in a case such as here, there is no historical "greater" punishment left to draw the "lesser" restriction from because Mr. Hetzel had already served the entirety of the sentence imposed for the predicate conviction providing the basis for disarmament.

Because Mr. Hetzel's situation falls squarely within the question *Richardson* expressly reserved, this Court should analyze it independently under *Bruen*'s framework. Using the historical materials *Richardson* catalogued reveals a historical tradition of *temporary* disarmament tied to an *ongoing* sentence. Given that such a link is entirely absent here, *Richardson* implicitly supports Mr. Hetzel's claims. In the absence of historical evidence supporting indefinite disarmament of a felons generally or Mr. Hetzel in particular, this Court should therefore find § 922(g) and D.C. Code §22-4503(a)(1) unconstitutional.

**C. The Government Cannot Alternatively Show That As Applied to Mr. Hetzel, § 922(g)(1) and D.C. Code §22-4503(a)(1) Allow for His Disarmament Under the Second Amendment.**

There are courts that have suggested that, even if a blanket felon ban cannot survive *Bruen*, history may support disarming a narrower category of "dangerous" felons. *See, e.g., United States v. Griffin*, No. 21-cr-00693, 2023 WL 8281564, at *8 (N.D. Ill. Nov. 30, 2023) (applying "distinctly similar" standard to uphold felon disarmament because "the problems of crime and recidivism have always existed in this nation"); *see also Kanter v. Barr*, 919 F.3d 437, 451, 454, 464 (7th Cir. 2019) (Barrett, J., dissenting) (recognizing that legislatures have historically "prohibited dangerous people from possessing guns"). Indeed, in *Rahimi*, the Supreme Court held that where a defendant's prior conviction demonstrates that he "poses a clear threat of physical violence to another, the threatening individual may be disarmed," at least temporarily. 602 U.S. at 698, 702. Even if, however, the necessary historical analogue existed to establish such a

framework here, the government cannot justify the disarming of Mr. Hetzel more than eight years after his predicate conviction for selling stolen goods, and more than a year after he completed every obligation flowing from his prior convictions - none of which was for a violent offense.

Importantly, Selling Stolen property is an offense that requires no showing that the defendant did anything more than what it describes – sell property that had been stolen. It contains no element of violence or attempted or threatened violence. There is nothing categorically or even specifically dangerous about the predicate offense charged in this case. Absent some individualized showing that Mr. Hetzel posed a present danger or was otherwise subject to disarmament, a stale, property conviction cannot supply the dangerousness rationale that some courts have found to be sufficient to find § 922(g) constitutional.

**IV. The District's Prohibition on Ghost Guns violates the Second Amendment**

Count Three must also be dismissed because the charged statute violates the Second Amendment. Mr. Hetzel has been charged under 22 D.C. Code § 4514(a), which prohibits the possession of so-called "ghost" guns.

A. Unserialized Firearms Fall Within The Plain Text Of The Second Amendment

An unserialized firearm is an "arm" within the meaning of the Second Amendment. The "18th-century meaning" of the term "arms" is "no different from the meaning today." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). Then, as now, the term generally referred to "[w]eapons of offence, or armour of defence." *Id.* (cleaned up). "All relevant sources of the original public meaning of 'arms' agreed that "all firearms constituted 'arms'" within the . . . meaning of that term." *Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, *4 (9th Cir. Aug. 7, 2023) (quoting *Heller*, 554 U.S. at 581). Unserialized firearms, accordingly, fall within the plain text of the word "arms" in the Second Amendment.

Mr. Hetzel anticipates that the government will argue that unserialized firearms are not "in common use" and thus fall outside the text of the Second Amendment, because, after Congress and the D.C. Council made possessing unserialized firearms illegal, law-abiding people do not possess them. This argument is wrong. Before *Heller* and *Bruen*, lower courts tried to limit the Second Amendment to arms that existed at the time of the founding. *See, e.g.*, *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (reversing state court decision that held that particular weapon at issue was not protected because it was not in common use at the time of the Second Amendment's enactment). The Supreme Court agreed that "the Second Amendment's definition of 'arms' [was] fixed according to its historical understanding," but it held that "that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2123. The *Bruen* court then used the "in common use" test invoked by the government here to explain why the Second Amendment's coverage extends to (some) modern firearms:

> Drawing from this historical tradition, we explained [in *Heller*] that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Bruen*, 142 S. Ct. at 2143.

In other words, *Bruen* and *Heller* held that the Second Amendment covers *both* firearms that were common at the time of the founding *and* those that are common today. *See* *Heller*, 554 U.S. at 582 ("[T]he Second Amendment extends, prima facie, to *all* instruments

that constitute bearable arms.") (emphasis added); *Bruen*, 142 S. Ct. at 2132 (same). Neither opinion suggested that the Second Amendment's definition of "arms" excluded guns that were commonly used for lawful purposes at the founding because they are uncommon today. Given the Supreme Court's heavy emphasis in *Heller* and *Bruen* on history and preserving the right as it was understood at the founding, any suggestion to the contrary fails. Indeed, a founding-era-style musket was undoubtedly an "arm" in 1791. *See, e.g.*, *United States v. Miller*, 307 U.S. 174, 180 (1939) (discussing the "in common use" test and describing laws from the time of the founding that *required* men to be armed with muskets or other equivalent arms). It is no longer the weapon of choice for self-defense, but no one would seriously argue that such a musket (even if manufactured recently) is not an "arm" under the Second Amendment. Because a musket was an arm in 1791 when the Second Amendment was ratified, it remains an arm now. For the same reason, unserialized firearms are arms within the meaning of the Second Amendment. Serial numbers were not required or in common use at the founding, and unserialized guns were in common use. Thus, Mr. Hetzel's possession of an unserialized firearm falls within the plain text of the Second Amendment.

**B. The Government Cannot Meet Its Burden To Show That Unserialized Firearms Can Be Banned**

The government cannot meet its burden by pointing to analogous founding-era regulations to justify its ban on unserialized firearms. Mr. Hetzel anticipates that the government will rely on laws banning weapons of unprecedented lethality, gunpowder regulations, and barrel proofing laws to attempt to justify its regulations. None of those laws, however, aid the government in meeting its burden.

In *Hanson v. D.C.*, 120 F.4th 223, 237 (D.C. Cir. 2024), the D.C. Circuit upheld a ban

on large capacity magazines at the preliminary injunction stage. It explained that historical bans on "Bowie knives or similar blades, and to a lesser extent pocket pistols" established a tradition of banning weapons of "unprecedented lethality." *Id.* at 237-38. This tradition, however, has no bearing on whether the government can ban unserialized firearms. Serial numbers are small numbers typically found on the barrel of firearms. Their presence or absence has no bearing on a firearm's functionality as a weapon and thus have no bearing on the gun's "lethality" at all.

The government may also rely on historical gunpowder laws. These laws, as part of a broader safety inspection framework, required gunpowder manufacturers and inspectors to label gunpowder casks with markings indicating who made the gunpowder and that the gunpowder had been inspected and found safe (or if not, that it was "condemned"). *See* 8 *Records of the State of Rhode Island and Providence Plantations in New England* 18-19 (1863); *New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey, Legislature Number 1* at 6-7; 3 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* 240-44 (1810); 2 *General Laws of Massachusetts from the Adoption of the Constitution to February 1822* at 199-200 (1823); *Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed* 276-78 (1830). In addition to requiring said markings, these laws authorized the appointment of inspectors of gunpowder; regulated the composition of gunpowder manufactured; specified what characteristics rendered powder to be "in proof"—meaning of conforming composition, safely storable and safely salable; prohibited the sale of deficient powder; limited the quantities of gunpowder which could be possessed or stored in a given location; and generally required licenses to sell or otherwise transfer gunpowder within certain

jurisdictions. *See id.* Gunpowder inspectors, manufacturers, and retailers who did not comply with these laws risked fines ranging from 50 cents to $500 and forfeiture of the non-compliant gunpowder. *See id.* Notably, these laws do not appear to have prohibited downstream gunpowder purchasers from storing the gunpowder separately from the required markings on the gunpowder casks or removing the marking from the casks all together. *See id.*[1] Founding-era gunpowder laws transparently regulated commerce as a matter of consumer and product safety. 22 D.C. Code § 4514(a), on the other hand, requires marking and serialization procedures to, ostensibly, aid in tracing firearms as a means of preventing violent crime. These two purposes are not alike. For that reason alone, these gunpowder laws are not relevantly similar to § 4514(a). Other than the fact that these regulations both required markings, they bear very little similarity to one another. The laws previously noted regulated gunpowder, not firearms. They also sought to regulate gunpowder manufacturers, retailers, and inspectors—not, as with the DC Code offense charged here, the end firearm user. The penalties associated with these offenses are very different too. The gunpowder laws imposed fines. Contrarily, 22 D.C. Code § 4514(a)(c)(1) is a criminal statute authorizing the court to sentence a defendant to five years in prison. The gunpowder laws are not analogous to § 4514(a)(c)(1).

Finally, the government may argue that two "barrel proofing statutes" enacted by Maine and Massachusetts—in 1805 and 1821 respectively—demonstrate a historical tradition of firearm Regulation which would support the constitutionality of D.C.'s ban on unserialized firearms. *See Laws of the Commonwealth of Massachusetts from November 28, 1780, to February 28, 1807*, at

[1] The only state laws that come anywhere close are Massachusetts and New Hampshire, which were focused on prohibiting the sale of condemned gunpowder but whose text about defacing inspection markings arguably swept more broadly. *See Gen. Laws of Mass.*, *supra*, at 199-200; *Laws of N.H.*, *supra*, at 277-78. Two states' regulations, however, do not establish a historical "tradition" of firearm regulation. *See Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that three colonial regulations could suffice to show a tradition of public carry regulation.").

259 (1807); *Laws of the State of Maine* 546 (1830). Laws in two lone states, however, do not establish a national tradition of firearm regulation. *See Bruen*, 142 S. Ct. at 2142.

Regardless, the "why" and "how" of these statutes are also different. "Barrel proofing" was a type of musket and pistol barrel-function testing, where appropriate sized ammunition was overloaded with powder in the gun on purpose.[2] Discharging the gun with the overloaded powder produced higher than normal pressures inside the barrel. *See supra* n.8. If the barrel as constructed could withstand the increased pressures from the overloaded discharge, it was expected to withstand the significantly lower pressures of non-overloaded discharges that occurred with regular use. *See id.* Proofing barrels either worked or failed. *See id.* For those that worked and passed the "proofing" process, the barrels were affixed with a stamp that gave notice of the identity of who proofed the barrel and that it had been safely proofed to work as intended. *See id.* Barrel proofing started being used by English gunsmiths during the 1630s.[3] The United States historically had no formal proofing houses (like European countries), so most U.S. manufacturers today voluntarily proof their own firearms.[4] In 1805 and 1821, Massachusetts and Maine passed laws requiring barrel proofing. *See Laws of the Commonwealth of Massachusetts from November 28, 1780, to February 28, 1807*, at 259 (1807); *Laws of the State of Maine* 546 (1830)). Those laws imposed fines for selling guns without proofing marks and altering any proofing marks that had been affixed. *See id.*

Like the gunpowder laws, barrel proofing and barrel proofing marks were consumer product safety measures adopted to protect firearm end-users and to improve firearm safety.

---

[2] *See* Joel Penkala, *The Barrel Proofing Process*, Shotgun Craftsmanship, Upland Gun Company (March 2, 2021), https://uplandguncompany.com/the-barrel-proofing-process/; George Harris, *What Does It Mean to Proof a Firearm?*, NRA Shooting Illustrated.com (29, 2020), https://www.shootingillustrated.com/content/what-does-it-mean-to-proof-a-firearm/ (last viewed Feb. 3, 2023).

[3] *See e.g.*, The Proof House, *Worshipful Company of Gunmakers*, https://www.gunmakers.org.uk/the-proof-house/.

[4] *See* NRA Museum, *Proof Mark Registry*, https://www.nramuseum.org/media/940944/proofmarks.pdf.

*See Laws of the Commonwealth of Massachusetts*, *supra* at 259 (explaining that the law was adopted to prevent the introduction of firearms "into use which are unsafe, and thereby lives of the citizens be exposed"). As a result, barrel proofing statutes were not "comparably justified" to § 4514(a), which is intended to facilitate crime-solving and prevent the spread of untraceable firearms. Moreover, as with the gunpowder regulations, the penalties associated with violating barrel proofing laws imposed fines, not jail time. They banned removal of those markings rather than possession knowing the markings had been removed.

In conclusion, none of the statutes considered are "relevantly similar"—much less "distinctly similar"—to § 4514(a)'s prohibition against possessing unserialized firearms. Using either *Bruen* inquiry, there is no fit—much less the necessary tight fit—between § 4514(a) and any founding-era tradition of firearm regulation. Mr. Hetzel also asserts that § 4514(a) is unconstitutional as applied to him given that the firearm did contain identifying numbers.

## IV. The Court Should Dismiss Count One Because Section 922(g)(1) Exceeds Congress's Commerce Clause Power.

### A. Section 922(g)(1)'s Possession Prohibition Exceeds Congress's Commerce Power Under *Lopez* and *Morrison*.

As construed and applied here, § 922(g)(1) reaches Mr. Hetzel's alleged possession of a firearm and ammunition based solely on the assertion that the firearm "had been possessed, shipped and transported" in commerce at some undefined earlier point. "So construed, it is difficult to see how § 922(g)(1) honors the principle of enumerated powers." *United States v. Bonner*, 159 F.4th 338, 341 (5th Cir. 2025) (Willett, J., concurring). Regulating mere possession, without any present connection to commerce, exceeds the outer boundary the Supreme Court drew in *Lopez* and *Morrison*.

Mr. Hetzel's case tracks *Lopez* closely. Firearm possession, like the school-zone possession at issue there, is non-economic. *Lopez*, 514 U.S. at 561, 567. The Supreme Court has "reject[ed] the argument that Congress may regulate non-economic, *violent* criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Morrison*, 529 U.S. at 617. That reasoning applies with at least equal force to the non-economic, *non-violent* possession alleged here. *See Bonner*, 159 F.4th at 342 (Willett, J., concurring) ("[A]ggregation is ordinarily appropriate only when the underlying activity is economic — and firearm possession is not.").

Furthermore, *Morrison* itself rejected a far more developed commerce theory than anything available or alleged here. Despite "extensive findings concerning the economic consequences of gender-motivated violence," the Court held that Congress lacked Commerce Clause authority to create a federal civil remedy for such violence because the government's theory rested on a "lengthy 'but-for' causal chain" that the Constitution does not tolerate. *Morrison*, 529 U.S. at 615-17. Accepting a contrary position would mean Congress "could regulate any crime," because "all activities affect interstate commerce" in some way in the aggregate. *Id.* Any theory here that a firearm's past unspecified interstate movement supplies a permanent jurisdictional hook for any subsequent possession anywhere by anyone suffers from the same defect identified in *Morrison* insofar as it has no logical stopping point.

Justice Thomas's concurrence in *Hermani* confirms this point. It emphasizes that Congress lacks the power to "regulate or ban possession of any item that has ever been offered for sale or crossed state lines." *Hermani*, 608 U.S. at 795 (Thomas, J., concurring) (quoting *Alderman v. United States*, 562 U.S. 1163, 1167 (2011) (Thomas, J., dissenting from denial of certiorari)). Treating a bare, backward-looking prior-travel allegation as constitutionally sufficient would

"convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 795-796. (quoting *Lopez*, 514 U.S. at 567 (Thomas, J., concurring)). As Justice Thomas explained, "the mere possession of a firearm that long ago crossed state lines is not 'economic activity' in any sense," and *Lopez* therefore forecloses using aggregation to sustain § 922(g)'s possession ban. *Hemani,* 608 U.S. at 798.

Nor does *Scarborough v. United States*, 431 U.S. 563 (1977), supply the missing constitutional authority. *Scarborough* held only that, as a matter of statutory interpretation, "proof that the possessed firearm previously traveled in interstate commerce is sufficient to satisfy the *statutorily required* nexus" in a predecessor version of § 922(g). *Id.* at 564 (emphasis added). It said nothing about the Constitution. "No party alleged that the statute exceeded Congress' authority, and the Court did not hold that the statute was constitutional." *Alderman*, 562 U.S. at 1167 (Thomas, J., dissenting from denial of certiorari). *See also Hemani*, 608 U.S. at 800 ("*Scarborough*'s holding was statutory, not constitutional.") (Thomas, J., concurring) (quoting *United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc)); *accord Bonner*, 159 F.4th at 342 (Willett, J., concurring). As a result, *Scarborough* and the cases that rely upon it simply do not establish that the Commerce Clause provides constitutional authority for prohibiting gun possession under § 922(g)(1).

### B. *Fraternal Order of Police* Does Not Foreclose Mr. Hetzel's Commerce Clause Challenge Because It Rests on a Flawed Rationale.

*Fraternal Order of Police v. United States*, 173 F.3d 898 (D.C. Cir. 1999), rejected a Commerce Clause challenge to § 922(g)(9) because the statute "contains a 'jurisdictional element': in any prosecution under the provision for possession, the government must prove that the defendant possessed the firearm 'in or affecting commerce.'" *Id.* at 907. In reaching that conclusion, the panel relied principally on *United States v. Bass*, 404 U.S. 336

(1971), and reasoned that *Bass* resolved a statutory ambiguity in the defendant's favor to require the commerce phrase to modify "receives" and "possesses," not just "transports" so that it was "unnecessary" for the Court even to consider "whether Congress could constitutionally punish the 'mere possession' of firearms." *Id.* at 907-08 (quoting *Bass*, 404 U.S. at 339 n.4). As a result, *Fraternal Order of Police* inferred that § 922(g)(9) "must also fall within Congress's authority." *Id.*

The Court's inference does not follow. For precisely the same reasons a growing body of authority has explained that *Scarborough* does not support federal regulation of gun possession through the Commerce Clause, neither does *Bass*. *Bass*, like *Scarborough*, was a decision of pure statutory construction. It did not hold, and did not purport to hold, that the statute it construed was a constitutional exercise of commerce power. To the contrary, the *Bass* Court went out of its way to say that its statutory resolution made it "unnecessary to reach the question whether, upon appropriate findings, Congress can constitutionally punish the 'mere possession' of firearms." *Bass*, 404 U.S. at 339 n.4. Treating *Bass*'s avoidance of the constitutional question as though it resolved that question in favor of Commerce Clause authority for the federal government to prohibit firearm possession is the identical error the Fifth Circuit, sitting en banc, is now being asked to correct with respect to *United States v. Rawls*, 85 F.3d 240 (5th Cir. 1996), as it relates to *Scarborough*. *See* Appellant's En Banc Br. at 36-38, *United States v. Squire*, No. 25-30324 (5th Cir.) ("*Scarborough* said nothing about the Constitution"; "*Scarborough* did not involve, nor did the Court address, the question of whether such a broad law was constitutionally permissible.") (citing *Alderman*, 562 U.S. at 1167 (Thomas, J., dissenting from denial of certiorari)).

Moreover, *Fraternal Order of Police* attempted to distinguish *Lopez* on the ground that

the school-zone statute there lacked "a jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce," whereas § 922(g) contains such an element. 173 F.3d at 907-08 (quoting *Lopez*, 514 U.S. at 561). But a jurisdictional element built on the *Bass*/*Scarborough* "minimal nexus" reading that is satisfied by nothing more than proof that a firearm crossed a state line at some point in the past does not perform the case-by-case gatekeeping function *Lopez* explicitly demanded. It ensures only that the government can recite the statutory phrase for federal jurisdiction under the Commerce Clause. A "minimal nexus" approach also fails to "ensure," as *Lopez* requires, that "the firearm possession in question" has any present connection to commerce. *Lopez*, 514 U.S. at 561.

Mr. Hetzel recognizes that *Fraternal Order of Police* remains the law of this Circuit as to its actual holding regarding § 922(g)(9). But *Fraternal Order of Police* does not resolve the immediate case, first, because it construed § 922(g)(9), not § 922(g)(1), and extending its reasoning here requires an independent judgment to expand the panel's holding. Second, even if *Fraternal Order of Police*'s reasoning extends to § 922(g)(1), it is built on the faulty inference of *Bass* described above, and its ultimate conclusion is only as that inference, which intervening authority has substantially eroded. Third, and independent of the first two points, even under *Fraternal Order of Police*'s own test, the indictment here fails to satisfy the case-by-case showing the panel itself said the Constitution requires, as explained below.

This Court should also recognize that *Fraternal Order of Police* was decided in 1999 and predates Justice Thomas's dissent from the denial of certiorari in *Alderman* (2011), joined by Justice Scalia, which first crystallized the critique that *Scarborough*-based reasoning "could very well remove any limit on the commerce power." 562 U.S. at 1167. It also predates both

the Fifth Circuit's decision to rehear *Squire* en banc on precisely this question, as well as Justice Thomas's concurrence in *Hemani* (2026), which collects and endorses this line of criticism. Mr. Hetzel presently raises the broader Commerce Clause challenge to preserve it for further review.

### C. Under *Fraternal Order of Police* Itself, the Indictment's Bare Jurisdictional Allegation Does Not Satisfy the Case-by-Case Inquiry *Lopez* Requires.

*Fraternal Order of Police* did not hold that the government may satisfy the necessity of a Commerce Clause nexus simply by reciting the statutory phrase "in or affecting commerce" in the indictment. It held that "in any prosecution under the provision for possession, the government must prove that the defendant possessed the firearm 'in or affecting commerce.'" *Fraternal Order of Police*, 173 F.3d at 907 (emphasis added). This is an evidentiary requirement, not a pleading formality and it is the same requirement *Lopez* itself demanded. After all, a jurisdictional element matters only if it "ensure[s], through case-by-case inquiry, that the firearm possession in question *affects* interstate commerce." *Lopez*, 514 U.S. at 561 (emphasis added).

The indictment here does not come close meeting this standard. It alleges only that the firearm and ammunition "had been possessed, shipped and transported in and affecting interstate and foreign commerce." It reflects a verbatim tracking of the statutory language, with no date, no route, and no circumstance of the asserted prior interstate movement. Nothing in the indictment ties that undated, unspecified history to Mr. Hetzel's alleged possession on March 24, 2026, in any way that a "case-by-case inquiry" could test. Because the government has not alleged and, indeed, cannot show the kind of case-by-case commerce connection that both *Lopez* and *Fraternal Order of Police* require, Count One of the Indictment fails to establish a constitutionally adequate jurisdictional basis. Dismissal is warranted on this ground

alone regardless of the broader infirmities underpinning *Fraternal Order of Police*.

VI. **Conclusion**

For the foregoing reasons, Mr. Hetzel respectfully asks this Court to dismiss Counts One , Two and Three of the Indictment as unconstitutional under the Second Amendment, both facially and as applied to him. He also asks this Court to dismiss Count One because it independently exceeds Congress's power under the Commerce Clause, both facially and as applied. In the alternative, Mr. Hetzel asks the Court to hold that the indictment's bare jurisdictional allegation fails to satisfy *Fraternal Order of Police*'s own test, and to find that there are no facts in this case supplying a basis for that jurisdiction allegation. In the event the Court only dismisses Count One, Mr. Hetzel asks the Court to decline to exercise jurisdiction over the remaining D.C. Code offense, so to avoid having this Court handle matters more appropriately brought in D.C. Superior Court.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
EUGENE OHM
Assistant Federal Public
Defender 625 Indiana
Avenue, N.W., Suite 550
Washington, D.C. 20004